# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MACK L. CHARLES,
    c/o V. Toensing, 1776 K Street, N.W.,
    #737, Washington, D.C. 20006,
    telephone: (202) 213-3726,

                  Plaintiff *pro se*,

    vs.

JOHN O. BRENNAN, DIRECTOR, CIA,
    Central Intelligence Agency,
    Washington, D.C. 20505,

SIX KNOWN, UNNAMED CIA
    OFFICERS, and

THE UNITED STATES CENTRAL
    INTELLIGENCE AGENCY,

                Defendants.

Case: 1:15-cv-00121
Assigned To : Leon, Richard J.
Assign. Date : 1/23/2015
Description: Employ Discrim.

**COMPLAINT**

**JURY TRIAL DEMANDED**

**RECEIVED**

JAN 2 3 2015

Clerk, U.S. District and
Bankruptcy Courts

## COMPLAINT

Former Central Intelligence Agency Non-Official Cover (NOC)[1] Operations Officer

Mack L. Charles[2] (NOC Charles), Plaintiff *pro se*, avers as follows:

### PRELIMINARY STATEMENT

1.    Beginning prior to Defendant Brennan's service as Director, United States Central

---

[1]  Use of the acronym "NOC" identifies Plaintiff's former status as a Non-Official Cover Operations Officer of the United States Central Intelligence Agency. The distinction between CIA NOC officers and CIA Official Cover officers is acknowledged on page 3 of the declaration of Stephen R. Kappes, Deputy Director, CIA, filed in the United States District Court for the Southern District of New York in *Wilson v. McConnell*, Civil No. 07 CV 4595, dated July 18, 2007, and available at: http://fas.org/sgp/jud/wilson/kappes071807.pdf.

[2]  Mack L. Charles is named as Complainant in CIA EEO Case No. 10-25, EEOC Appeal No. 0120120142, and EEOC Request for Reconsideration No. 0520140422.

Intelligence Agency, several CIA managers – including the current Chief of CIA's

Global Deployment Center (GDC), hereinafter referred to by the alias "Imelda" –

conspired to retaliate against NOC Charles for his resort to CIA's Equal Employment

Opportunity (EEO) system in May and June 2009. [3]

2.    As detailed below, Imelda has pursued this retaliation against NOC Charles up to and

including the day of the filing of this Complaint.

3.    The retaliation visited on NOC Charles is in violation of 42 U.S.C. § 2000e, *et seq.*

(Title VII of the Civil Rights Act of 1964), as amended by the Civil Rights Act of

1991.

4.    This retaliatory conspiracy has included intense, minute scrutiny, in June and July

2009, of NOC Charles' entire record of service immediately following his resort to

the EEO system.

5.    Imelda's conspiratorial retaliation has included the presentation of false accusations

against NOC Charles to a CIA Personnel Evaluation Board (PEB) in October 2009,

in violation of the Federal False Statements Act, 18 U.S.C. § 1001.

6.    When those false accusations proved insufficient to secure NOC Charles' firing, and

the PEB took no action in October 2009, Imelda resorted in May 2010 to using

newly-created false evidence solicited by GDC management.

7.    Thus, Imelda's retaliation has also included knowingly using, in May 2010, a false

official CIA memorandum dated January 5, 2010 – a memorandum that purported to

---

[3]  The record in this case includes a redacted, declassified Report of Investigation (ROI) prepared
by CIA's Office of Equal Employment Opportunity. ROI citations herein are to that redacted,
declassified ROI. In the ROI, Imelda is identified as Affiant E-3. NOC Charles intends to
identify at trial each of the other CIA officers involved in Imelda's conspiracy of retaliation.

document alleged performance problems from many years earlier that had never been mentioned by anyone, that were utterly contradicted by the extant record, and for which there was no corroborating evidence – in order to secure termination of NOC Charles' employment, in further violation of the False Statements Act.[4]

8.   Imelda's retaliatory criminal conspiracy resulted in the firing of NOC Charles, after more than 13 years of honorable and loyal CIA service, in December 2010.

9.   The retaliatory conspiracy against NOC Charles has also included Imelda and other managers making false statements in sworn EEO declarations signed in January 2011, and thus the repeated commission of the federal felony of perjury.

10.   As NOC Charles learned after the fact from other NOC officers, Imelda took the monstrous step – after having secured NOC Charles' firing using "evidence" fabricated subsequent to the initiation of a PEB proceeding – of retaliating against him by ordering NOC Charles' fiancée, also a CIA NOC officer, to have no further contact with him after March 2011, resulting in NOC Charles' having been totally separated from his fiancée, with no contact from her or information concerning her wellbeing, for almost four years, up to and including the day of the filing of this Complaint.

11.   NOC Charles thinks about his fiancée every day and misses her as much today as on the first day of his forced separation from her.

12.   The retaliation against NOC Charles has included wrongful interference in the 2014 deliberations of CIA's Publications Review Board, which, at Imelda's direction, has

---

[4]  A redacted, declassified copy of that false memorandum from the ROI – key evidence in support of NOC Charles' claim of retaliation – is attached hereto as Attachment 1. The false statements in Attachment 1 are described in detail in paragraphs 79 through 85 below.

illegally and unconstitutionally denied NOC Charles the right to publish even one word of his satirical novel about CIA; for the purpose of this Complaint, NOC Charles is referring to his book as *Madhouse: A Forbidden Novel of the CIA*.

13. *Madhouse: A Forbidden Novel of the CIA* is a work of fiction that explores and elucidates, through satire, the myriad ways CIA has devolved into a corrupt bureaucratic basket case that is no longer focused on its original mission of protecting America and is desperately in need of overhaul.

14. As a result of his illegal firing, NOC Charles has suffered well over $600,000 in lost income from his CIA employment.

15. To try to cover this income shortfall, supporters of NOC Charles are creating a GoFundMe.com crowdfunding account called "Support NOC Charles."

16. NOC Charles is entitled to damages including, but not limited to, compensation for the above-described multiple and ongoing acts of retaliation, compensation for the severe pain and suffering caused by Defendant Brennan's subordinates – and in particular Imelda – compensation for severe damage to NOC Charles' reputation, compensation for severe economic losses, punitive damages in the amount of at least $25,000,000, and all such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

17. This employment discrimination lawsuit alleging retaliation is based on 42 U.S.C. § 2000e, *et seq*. (Title VII of the Civil Rights Act of 1964), as amended by the Civil Rights Act of 1991.

18. The Court has subject matter jurisdiction over this action alleging employment discrimination pursuant to 28 U.S.C. § 1331.

19.   The Court has supplemental jurisdiction over NOC Charles' related state law claims

pursuant to 28 U.S.C. § 1367(a), in that NOC Charles' state law claims form part of the

same case or controversy under Article III of the United States Constitution. NOC

Charles' state law claims share all common operative facts with his federal law claim,

and the parties are identical. Resolving all state and federal claims in a single action

serves the interests of judicial economy, convenience, and fairness to the parties.

20.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Defendant Brennan

pursues CIA objectives and maintains his main mailing address in this District.

## PARTIES

21.   NOC Charles is a citizen of the United States of America.

22.   NOC Charles' contact information is as follows:

> Mailing address:
>
> c/o V. Toensing
> 1776 K Street, N.W.. #737
> Washington, D.C. 20006
>
> Telephone:  (202) 213-3726   Email: macklcharles@yahoo.com

23.   Defendant Brennan is a citizen of the United States of America.

24.   Defendant Brennan's contact information is as follows:

> Mailing address:
>
> Central Intelligence Agency
> Washington, D.C. 20505
>
> Telephone: (703) 482-0623

25.   Upon information and belief, Defendant Brennan's known, unnamed agents cited in

the caption to this Complaint are citizens of the United States of America who share

Defendant Brennan's address and telephone number.

## FACTUAL ALLEGATIONS

### NOC Charles' CIA Employment

26.   In 1996 NOC Charles accepted a position with CIA as a NOC Operations Officer in CIA's Directorate of Operations ("DO").  (ROI C:00003)

27.   NOC Charles' mission was to go overseas without diplomatic immunity, spy on America's adversaries – at the risk of his freedom and potentially his life – and send secret foreign intelligence back home.

28.   NOC Charles underwent tradecraft training, during which he was awarded the first of four Exceptional Performance Awards.  (ROI C:00400)

29.   Following completion of his tradecraft studies, NOC Charles was certified as a NOC Operations Officer, completed an "on-the-job training" assignment, and was deployed overseas to collect foreign intelligence.  (ROI C:00400)

30.   In carrying out his intelligence collection mission, NOC Charles never worked inside a U.S. Embassy.

31.   On November 3, 2002, based on his successful performance overseas and the strongly-positive evaluations accorded to him by of his supervisors, NOC Charles was promoted to GS-14 (equivalent to a Lieutenant Colonel in the U.S. military).  (ROI C:00003-4; C:00401)

32.   On December 17, 2002, NOC Charles' then-Division Chief – Affiant E-7 in the ROI, referred to hereinafter by the alias "Chester"[5] – certified NOC Charles out of his three-year trial period, according him all the rights of a CIA staff officer.  (ROI C:00401)

---

[5]   Although Chester has retired from the Agency and freely acknowledged his prior CIA employment in his Linkedin.com profile and elsewhere, NOC Charles chooses to refer to him here in alias.

33.   In spring 2003, NOC Charles' then-supervisors – Chester and Imelda – personally selected him to be one of only a very small number of officers to serve in an elite DO Group composed of Operations Officers in the same category as NOC Charles (while many other officers were rejected).  (ROI C:00401)

34.   Also during this time, NOC Charles received a "non-monetary" award (effectively, his second Exceptional Performance Award) from CIA managers in a Latin American country for his integral role in the recruitment there of a key new human source of foreign intelligence.  (ROI C:00080, C:00157)

35.   In summer 2003, NOC Charles volunteered for service as an intelligence collector in a war zone, the first – indeed, the only – officer from his Group to step forward for this extremely hazardous service at that time.  (ROI C:00401-402)

36.   NOC Charles carried out his war-zone service in 2003-2004, receiving written accolades in two official Agency cables (one of which lauded his role in the recruitment of an important new human source of foreign intelligence, and the other of which ended by stating "This is an excellent officer.").  (ROI C:00158-159)

37.   NOC Charles was presented an Exceptional Performance Award in recognition of his war-zone service.  (ROI C:00402)

38.   NOC Charles then returned to his country of assignment and continued serving overseas until mid-2005.  (ROI C:00403)

39.   At that time, NOC Charles' tested foreign language scores, on the U.S. State Department test scale of 1 to 5, were 4+, 4+, 4+, just under native-level ability.

40.   From mid-2005 through 2006, NOC Charles served as a tradecraft instructor at the Agency's main training center.  (ROI C:00004)

41.   During this period, the head of the training center – again Chester – personally awarded NOC Charles two Exceptional Performance Awards for his exemplary service as an instructor.  (ROI C:00159)

42.   In November 2006, NOC Charles' GDC managers selected him to become Deputy Chief of the Group to which he belonged within GDC, a de facto promotion.  (ROI C:00004)

43.   In this position, NOC Charles exercised supervisory authority over more than 80 subordinates, including other NOC Operations Officers in his Group. (ROI C:00122-127)

44.   Prior to this assignment, NOC Charles had supervised a maximum of just 8 subordinates while at CIA.

45.   NOC Charles' performance evaluation for the six months during which he served as Deputy Chief of his Group accorded him the highest overall rating, "Exceeds Expectations." (ROI C:00122-127)

46.   Based on this strong performance, NOC Charles' managers elevated him to the position of Chief of the Group – traditionally a Senior Intelligence Service "feeder" position – in August 2007.  (ROI C:00128)

47.   Subsequently NOC Charles' management selected him for a prestigious week-long Agency seminar on leadership reserved for officers identified as candidates to enter the Senior Intelligence Service ranks.  (ROI C:00137-144)

48.   In late 2007, NOC Charles' managers formally recommended him for promotion to GS-15.  (ROI C:00405)

49.   NOC Charles' Performance Appraisal Report rating for the period of his service as

Group Chief was "Successful – Positive and Valued Performance." (ROI C:00599)

50.     In summer 2008 GDC's Personnel Management Committee approved NOC Charles for a new overseas assignment as a NOC collector of intelligence, focused on, among other targets, the financing of terrorism.  (ROI C:00069)

51.     From then until summer 2009, NOC Charles prepared for this onward assignment, working with various CIA offices to validate intelligence targets for the mission, nailing down administrative details, and undertaking numerous trips overseas in anticipation of eventual overseas deployment.  (ROI C:00069)

52.     During the entire period from his arrival at CIA until fall 2008, every one of NOC Charles' annual performance ratings was the equivalent of either "Meets Expectations" or "Exceeds Expectations." Moreover, as detailed above, NOC Charles received Exceptional Performance Awards on four separate occasions during this period.

53.     Beginning in early 2009, NOC Charles observed a series of actions which led him to conclude that several of his managers were attempting to undermine his relationship with his fiancée, who is 21 years his junior, and improperly interfere with his and her future service as a tandem NOC couple.

54.     Believing these actions were motivated by unlawful discrimination on the basis of his age (over 40), NOC Charles sent his managers an email on Friday, May 8, 2009, warning them that he believed they were violating his EEO rights and demanding that they cease all such efforts.  (ROI C:00166)

### The Retaliation Visited on NOC Charles

55.     On the next business day, Monday, May 11, 2009, unbeknownst to NOC Charles, his

managers initiated a "security scrub" of his security file so that they could look for any derogatory information that might be there.  (ROI C:00411)

56.     This was the start of a long series of conspiratorial actions – constituting one continuing violation – taken in retaliation for NOC Charles' expression of his intention to defend his rights under the Equal Employment Opportunity laws and regulations.

57.     On June 9, 2009, NOC Charles approached the Agency's Office of Equal Employment Opportunity, and the next day he filed a formal EEO complaint of age discrimination. (ROI C:00004)

58.     During the second half of June and on into July 2009, unbeknownst to NOC Charles, his managers orchestrated a line-by-line search of NOC Charles' entire 12-year record of employment in furtherance of unlawful retaliation against NOC Charles for his resort to the EEO system.  (ROI C:00287-288)

59.     NOC Charles' GDC managers stated in their sworn EEO affidavits that they pulled together two linear feet of material in carrying out this search.  (ROI C:00287-288)

60.     On July 13, 2009, Imelda called NOC Charles to a meeting in her office.  (ROI C:00140-142)

61.     There, in further retaliation, Imelda ordered NOC Charles to cease all activity relating to his onward overseas assignment, citing spurious reasons for this action.  (ROI C:00140)

62.     On July 23, 2009, a manager whom NOC Charles had identified as a discriminator in his June 2009 EEO complaint emailed to Imelda the following language to be included in GDC's request to convene a Personnel Evaluation Board (PEB): "He has

already **filed an EEO grievance** against members of his management chain . . . ."
(ROI C:00444) (Emphasis added.).

63.  This reference constitutes direct evidence of retaliation.

64.  On August 5, 2009, GDC management submitted its PEB request to the Agency office
     charged with determining whether or not a PEB was warranted.  (ROI C:00574)

65.  An attachment to GDC's PEB request contained language identical to the July 23,
     2009, email described just above, *i.e.*, language that directly referred to NOC Charles'
     prior protected EEO activity.  (ROI C:00608-609)

66.  This reference constitutes direct evidence of retaliation.

67.  In addition to this direct reference to NOC Charles' prior protected EEO activity,
     GDC's PEB request contained numerous demonstrably false and misleading
     statements about NOC Charles' conduct and performance on the job, including false
     statements violative of the Federal False Statements Act, 18 U.S.C. § 1001.

68.  Upon being shown GDC management's false and misleading allegations on
     September 16, 2009, NOC Charles realized he was being subjected to retaliation.

69.  NOC Charles then filed the EEOC retaliation case that led to the filing of the instant
     Complaint.

70.  In a written response to Imelda's false allegations against him, NOC Charles provided
     documentary evidence answering and disproving the allegations.  (ROI C:00073-88)

71.  For example, Imelda and her team falsely accused NOC Charles of several minor time
     and attendance violations, which NOC Charles rebutted with documentary evidence.

72.  Imelda further faulted NOC Charles for, *e.g.*, late accounting submissions, when she
     knew full well, as NOC Charles showed, that many other NOC officers also had late

accountings due to GDC's byzantine NOC accounting requirements.

73. On October 28, 2009, the PEB met to consider Imelda's allegations against NOC Charles, along with his responses to those allegations.

74. After deliberation, the PEB decided to take no action.

75. This reflected that the PEB, after reviewing NOC Charles' written response and service record, concluded there was no firing offense among the many false and misleading allegations put forward by Imelda and her team.

76. Sometime in late December 2009, NOC Charles' managers contacted Chester – then serving as Chief of CIA's Special Activities Division – and solicited from him a false official memorandum to bolster GDC management's PEB case against NOC Charles. (ROI C:00243)

77. Chester signed and dated that false memorandum on January 5, 2010 (date corrected by Chester in ink from original, incorrect date of 2009 to 2010). (ROI C:00648-652)

78. A redacted, declassified copy of Chester's false memorandum from the ROI is attached to this Complaint as Attachment 1.

79. Chester's memorandum falsely claimed – citing no corroborating evidence whatsoever – that NOC Charles had "failed" in 2002-2003. (ROI C:00649)

80. As recorded in NOC Charles' annual Performance Appraisal Report, 2002-2003 was the period when NOC Charles was promoted to GS-14 (ROI C:00003-4; C:00401), when Chester personally certified NOC Charles out of his Agency probationary period and made NOC Charles a full-fledged CIA officer (ROI C:00401), and when Chester and Imelda personally selected NOC Charles to be a member of the elite Group of NOC Operations Officers to which he belonged for the rest of his time at the Agency.

(ROI C:00401)

81.   Chester's memorandum falsely claimed – citing no corroborating evidence whatsoever – that NOC Charles' official accountings had been "a nightmare" in 2002-2003, a period when the Budget & Finance office expressly praised NOC Charles' accountings in his annual Performance Appraisal Report. (ROI C:00158)

82.   Chester's memorandum further falsely claimed – citing no corroborating evidence whatsoever – that Chester and two other unnamed senior CIA officers had suspected NOC Charles of serious financial impropriety (criminal conduct) during 2002-2003, but did nothing about it and never mentioned it to anyone.  (ROI C:00649)

83.   The memorandum falsely claimed – citing no corroborating evidence whatsoever – that NOC Charles' voluntary 2003-2004 war-zone service had been "unremarkable," (ROI C:00650) despite the numerous written accolades NOC Charles had received for that service.

84.   Chester's memorandum falsely claimed – citing no corroborating evidence whatsoever – that NOC Charles had been "counseled directly" while serving at the Agency's training center during 2005-2006 (a period when Chester personally awarded NOC Charles two Exceptional Performance Awards) about alleged "inappropriate personal contact with a female student" as well as alleged "potentially arbitrary and capricious" evaluations of students.  (ROI C:00650)

85.   The memorandum further falsely claimed – citing no corroborating evidence whatsoever – that Chester and two other unnamed senior officers had suspected NOC Charles of serious financial impropriety (criminal conduct) during 2005-2006, but did nothing about it and never mentioned it to anyone.  (ROI C:00650)

86.   Chester's memorandum recommended that NOC Charles be relieved of his job.  (ROI C:00651,

87.   Not one of these allegations had appeared in GDC management's August 5, 2009, PEB request, even though that request was based on a searching review of the two linear feet of material constituting NOC Charles' entire record of service.

88.   Indeed, all of Chester's false allegations were contradicted by the extant record, as well as by the contemporaneous actions of NOC Charles' managers, including Chester and Imelda themselves.

89.   Chester admitted in a January 2011 EEO sworn statement that he was aware of no documents related to his January 5, 2010, memorandum.  (ROI C:00493)

90.   Chester also admitted in his EEO sworn statement that he was aware of no persons who could corroborate his January 5, 2010, memorandum.  (ROI C:00492-493)

91.   On May 5, 2010, the PEB reconvened at Imelda's request.

92.   At the end of that May 2010 PEB meeting, Imelda presented Chester's false January 5, 2010, memorandum – knowing it to be false and with the intention of misleading the PEB – and used it as evidence against NOC Charles, in violation of the Federal False Statements Act, 18 U.S.C. § 1001.

93.   **The five-year statute of limitations on this False Statements Act violation will not run until May 2015.**

94.   NOC Charles was never provided any opportunity to address the PEB in order to respond to Chester's false memorandum and, indeed, found out only much later that Imelda had presented this false memorandum.

95.   Imelda's resorting to the use of Chester's false memorandum shows that the earlier false

and misleading claims she made were merely pretexts for retaliation.

96. After Imelda presented Chester's false memorandum. the PEB voted to recommend that NOC Charles be fired.

97. NOC Charles appealed the PEB's recommendation, but was fired nonetheless, in December 2010.

98. In January 2011 Imelda and Chester provided signed, sworn statements to the Agency's OEEO which included knowingly-false statements – and in particular knowingly-false statements concerning the genesis of Chester's false January 5, 2010, memorandum – constituting new overt acts in furtherance of their criminal conspiracy of retaliation.

99. **Consequently, the statute of limitations on that criminal conspiracy will not run until at least January 2016.**

100. As NOC Charles later learned from other NOC officers, in March 2011 Imelda ordered NOC Charles' fiancée, herself a NOC, to cease all contact with him.

101. As NOC Charles further learned from other NOC officers, Imelda threatened NOC Charles' fiancée in an official Agency email that, if she had any further contact with NOC Charles, Imelda would recall her to CIA Headquarters and never allow her to work overseas in pursuit of her chosen career path of collecting foreign intelligence as a NOC Operations Officer.

102. Because of this illegal and retaliatory order, NOC Charles has had no contact with his fiancée for nearly four years, up to and including the day of the filing of this Complaint.

103. In January 2014, NOC Charles sent the manuscript of his novel *Madhouse: A Forbidden Novel of the CIA* to CIA's Publications Review Board (PRB) for pre-

publication review.

104.    According to the PRB's website, the central mandate of this board is "determining the absolute minimum of deletions. if any, that would uphold both the DCI's authority [to protect intelligence sources and methods] and [the] constitutional right to free speech under the First Amendment, a right the courts take especially seriously."[6]

105.    In May 2014 the PRB informed NOC Charles that, at the direction of GDC – of which Imelda was now Chief – NOC Charles would not be permitted, even using a pen name, to publish even one word of *Madhouse*.

106.    In doing so, the PRB identified not a single requested deletion.

107.    In June 2014, NOC Charles met with representatives of the PRB and GDC to discuss this refusal to permit NOC Charles to publish his book.

108.    It was clear to NOC Charles at that meeting that it was GDC, led by Imelda, that had ordered the PRB to disallow publication of any portion of NOC Charles' novel, in violation of NOC Charles' right to free speech under the First Amendment to the United States Constitution.

109.    Imelda's GDC representatives present at the June 2014 meeting, rather than the PRB representatives, led the discussion and offered specious reasoning for disallowing publication.

110.    The GDC representatives asserted that NOC Charles could not publish his novel even under a pen name because the act of doing so might reveal his former true-name affiliation with CIA, even though no part of the content of *Madhouse* reveals NOC Charles' true-name identity.

_____

[6] "Reviewing the Work of CIA Authors – Secrets, Free Speech, and Fig Leaves," John Hollister Hedley, available at www.cia.gov.

111.   One of the GDC representatives present, GDC lawyer Kathleen McGinn, defended

this assertion by claiming that NOC Charles' former CIA affiliation might be exposed

were he to undertake a book tour, something NOC Charles has no intention of doing.

112.   Both GDC and the PRB asserted that the use of a pen-name or alias – such as the one

CIA itself has required NOC Charles to use in the instant retaliation case expressly for

cover-protection purposes – would not protect the fact of his former true-name

affiliation with CIA.

113.   The PRB has, however, previously authorized publications in pen name by another

CIA NOC officer who served in exactly the same position as NOC Charles.[7]

114.   As GDC and the PRB are aware, that fellow NOC officer, who published an

unauthorized book as well as numerous PRB-authorized articles under the pen name

"Ishmael Jones," has not had his former true-name affiliation with CIA exposed due to

either his unauthorized or his authorized publications.

115.   Indeed, when CIA sued Ishmael Jones following the publication of his unauthorized

book, the Agency argued strenuously and successfully *for* the use of his pen name in

the lawsuit in order to protect the fact of his former true-name affiliation with CIA.

116.   NOC Charles requested in writing that the PRB reconsider its decision not to allow

him to publish under a pen name, but that request was denied in an undated letter

mailed to NOC Charles in late August 2014.

117.   The unconstitutional and illegal ruling by the PRB to disallow NOC Charles'

---

[7] For two examples of such publications approved by the PRB, see:
http://www.powerlineblog.com/archives/2014/11/ishmael-jones-panettas-betrayal.php#! – **which
was approved for publication *after* NOC Charles' novel was rejected** – and:
http://www.powerlineblog.com/archives/2012/09/ishmael-jones-after-benghazi.php.

publication of even one word of his book – founded on GDC's retaliatory interference – constitutes further and continued retaliation by Imelda.

118.  The retaliation visited on NOC Charles and detailed above constitutes one continuous violation that has continued through the day of the filing of this Complaint.

119.  The retaliation visited upon NOC Charles and detailed above has caused severe economic harm, severe harm to NOC Charles' reputation, and severe emotional distress.

120.  In carrying out their retaliatory criminal conspiracy to achieve NOC Charles' firing, as detailed above, Imelda and Chester held NOC Charles to a far higher standard than they held themselves.

121.  First, upon information and belief, and as NOC Charles intends to prove at trial, Imelda was an abject failure during her very short operational life overseas, following which she was permanently ordered back to CIA Headquarters to become the boss of officers more capable than she.

122.  Second, upon information and belief, and as NOC Charles intends to prove at trial, Imelda has exhibited major alcohol abuse behavior that has substantially interfered with her ability to carry out her work and required her to undergo rehabilitation.

123.  Third, upon information and belief, and as NOC Charles intends to prove at trial, most recently, as Chief of GDC, Imelda has overseen a failed multi-billion dollar CIA intelligence collection program shot through with waste, fraud, and abuse, a program described by the *Los Angeles Times* in December 2013 as a "colossal flop."

124.  Upon information and belief, and as NOC Charles intends to prove at trial, Chester, equally, had an extremely checkered career at the Agency marked by major alcohol

abuse behavior.

125. Upon information and belief, and as NOC Charles intends to prove at trial, Chester's career culminated in his being ordered back from his final overseas posting short of tour due to the last in a long series of sexual harassment complaints lodged against him.

126. Upon information and belief, and as NOC Charles intends to prove at trial, Chester was forced into retirement shortly thereafter.

127. In addition, upon information and belief, and as NOC Charles intends to prove at trial, both Chester and Imelda are felons, having violated the Federal False Statements Act, 18 U.S.C. § 1001, in making and using Chester's false January 5, 2010, memorandum.

128. Also, upon information and belief, and as NOC Charles intends to prove at trial, these two managers committed additional overt acts in furtherance of their conspiratorial retaliation when they both made false statements, including false statements concerning the genesis of Chester's January 5, 2010, memorandum, and thus committed the federal felony of perjury, in their January 2011 EEO sworn statements.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

129. NOC Charles has exhausted his administrative remedies. He timely filed administrative charges of retaliation with CIA's Office of Equal Employment Opportunity and with the U.S. Equal Employment Opportunity Commission. In ruling against NOC Charles, neither of these bodies addressed either the EEOC's "continuing violation" doctrine or Chester's false January 5, 2010, memorandum, even though NOC Charles clearly identified and fully briefed the facts and the law concerning these matters.

130. A copy of NOC Charles' Notice of Right to Sue letter from the EEOC is attached hereto as Attachment 2.

## FIRST CLAIM FOR RELIEF

### (UNLAWFUL DISCRIMINATION BASED ON RETALIATION)

131. NOC Charles realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

132. As detailed above, Defendant Brennan's agents have retaliated against NOC Charles, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.§ 2000e-16, *et seq.*, as amended, for his having participated in the EEO process by filing a complaint alleging discrimination.

133. As a direct and proximate result of the actions of Defendant Brennan's agents, NOC Charles has suffered severe emotional injury, severe reputational injury, and severe economic losses.

134. NOC Charles claims damages in an amount to be proven at trial, including all relief the Court may deem proper.

## SECOND CLAIM FOR RELIEF

### (CIVIL CONSPIRACY)

135. NOC Charles realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

136. As detailed above, Defendant Brennan's agents had an agreement to act in concert to retaliate against NOC Charles and committed numerous overt acts in furtherance of that agreement, including federal felonies.

137. The criminal acts of Defendant Brennan's agents deprive them of sovereign immunity.

138. As a direct and proximate result of the actions of Defendant Brennan's agents, NOC Charles has suffered severe emotional injury, severe reputational injury, and severe economic losses.

139. NOC Charles claims damages in an amount to be proven at trial, including all relief the Court may deem proper.

### THIRD CLAIM FOR RELIEF

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

140. NOC Charles realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

141. Defendant Brennan's agents acted with the intent to cause, and did cause, NOC Charles severe emotional distress by, among other things, terminating his employment through the use of false evidence created during the pendency of a CIA PEB proceeding, unjustly and illegally ordering NOC Charles' fiancée to break off all contact with him, and interfering illegally and in violation of his rights under the First Amendment to the United States Constitution with his efforts to publish his novel.

142. As a direct and proximate result of the actions of Defendant Brennan's agents, NOC Charles has suffered severe emotional distress.

143. Defendant Brennan's agents acted intentionally or with reckless disregard for the high probability that severe emotional distress would occur.

144. Defendant Brennan's agents committed these acts maliciously and oppressively, in wanton and willful disregard of NOC Charles' rights.

145. The criminal acts of Defendant Brennan's agents deprive them of sovereign immunity.

146. NOC Charles claims damages in an amount to be proven at trial, including all relief

the Court may deem proper.

## FOURTH CLAIM FOR RELIEF

### (PUNITIVE DAMAGES/SPECIAL DAMAGES)

147.   NOC Charles realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

148.   The tortious conduct of Defendant Brennan's agents as alleged herein was undertaken deliberately and with actual malice, that is, with a sense of consciousness and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud.

149.   The criminal conduct of Defendant Brennan's agents in carrying out these tortious acts deprives them of sovereign immunity.

150.   The conduct of Defendant Brennan's agents involved reckless or callous indifference to the federal- and state-protected rights of NOC Charles. This conduct caused NOC Charles to suffer severe reputational, financial, and emotional harm, including through the loss of the companionship of his fiancée.

151.   NOC Charles is entitled to an award of punitive damages, based upon the malicious conduct of Defendant Brennan's agents, in the amount of at least $25,000,000, or such other amount as may be determined at trial.

## EQUITABLE TOLLING OF FILING PERIOD

152.   On August 28, 2014, the EEOC mailed NOC Charles a letter stating that his request for reconsideration of the EEOC's ruling against him on his retaliation claim had been denied. On the same day that he received that letter, NOC Charles received notice from CIA's Publications Review Board that the PRB would not permit him to publish even one word of his novel.

153. These simultaneous negative events, and the realization that, as a result, he might never be able to reconnect with his fiancée, caused NOC Charles to fall into a deep depression.

154. NOC Charles' depression rendered him incapable of handling his affairs in such a way as to be able to prepare the instant Complaint within the 90-day period specified in the EEOC's Notice of Right to Sue letter.

155. When NOC Charles attempted, in early November 2014, to obtain the assistance of counsel – namely Washington, D.C., attorney Mark Zaid, Esq. – and have attorney Zaid cleared to represent him, CIA's Office of the General Counsel (OGC) told NOC Charles that he, NOC Charles, had to sign a new secrecy agreement before attorney Zaid could be cleared.

156. OGC repeated this demand that NOC Charles sign a new secrecy agreement to attorney Zaid.

157. This requirement was unprecedented both to NOC Charles, who had gotten Washington, D.C., attorney Victoria Toensing, Esq., cleared to represent him before CIA's OEEO without any such requirement, and to attorney Zaid, who had never heard of such a requirement in his many years of representing CIA officers.

158. OGC's conditioning NOC Charles' access to legal assistance on his signing a new secrecy agreement – years after NOC Charles' employment had been illegally terminated by his managers – was improper, illegal, and unconstitutional.

159. NOC Charles believes this new, unprecedented requirement was interposed in order to throw yet another retaliatory obstacle in his path.

160. Without the assistance of counsel, NOC Charles was unable to go forward with his

Complaint on his own due to the depression brought on through the malevolent actions of Defendants' subordinates.

161. In late November 2014, under the care of a physician, NOC Charles began taking a prescribed antidepressant medication.

162. Subsequently, NOC Charles has experienced a recovery from his depression sufficient to enable him to prepare and file the instant Complaint *pro se*.

163. NOC Charles respectfully requests that, under the circumstances detailed above, the Court exercise its equitable powers to toll the limitations period for his retaliation claim and deem the Complaint timely as to that claim, as well as to his other claims.

## DEMAND FOR JURY TRIAL

164. NOC Charles is entitled to and hereby demands a jury trial in this matter.

## RELIEF REQUESTED

165. NOC Charles respectfully requests that judgment be entered in his favor as follows:

166. Require that NOC Charles be reinstated with retroactive promotions, salary, and benefits;

167. Award NOC Charles compensatory and punitive damages in an amount to be calculated at trial for violations of federal and state law;

168. Award NOC Charles prejudgment and post-judgment interest;

#

#

#

#

#

#

169.   Award NOC Charles reasonable costs and, as applicable, attorneys' fees; and

170.   Grant such other and further relief as the Court deems just and proper.

Dated:  January 23, 2015

Respectfully submitted,

Mack L. Charles

Plaintiff *pro se*

c/o V. Toensing
1776 K Street, N.W., #737
Washington. D.C. 20006

Telephone: (202) 213-3726
Email: macklcharles@yahoo.com